Robert L. Nowland and Mary C. Nowland, His Wife v. Commissioner. The North Beach Amusement Company, Inc. v. Commissioner. Charles E. Nelson and Virginia M. Nelson, His Wife v. Commissioner.
Nowland v. Commissioner
Docket Nos. 48472, 48661, 48662.
United States Tax Court
T.C. Memo 1956-72; 1956 Tax Ct. Memo LEXIS 224; 15 T.C.M. (CCH) 368; T.C.M. (RIA) 56072; March 23, 1956
*224 E. H. Young, Esq., 34 Central Savings Bank Building, Baltimore, Md., for the petitioners. William Schwerdtfeger, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent in these consolidated proceedings determined deficiencies in income tax and additions to tax, as follows: Additions
to Tax
Year
Petitioner
Deficiency
Sec. 294(d)
1948
Robert L. and Mary C. Nowland
$ 5,627.36 $
1949
Robert L. and Mary C. Nowland
5,080.70
1950
Robert L. and Mary C. Nowland
925.10
138.78
1948
Charles E. and Virginia M. Nelson
8,772.26
1949
Charles E. and Virginia M. Nelson
10,241.02
1950
Charles E. and Virginia M. Nelson
20,209.46
2,485.97
1949
North Beach Amusement Co., Inc.
3,710.00
1950
North Beach Amusement Co., Inc.
8,839.79
The issues remaining are: 1. Whether profit before expenses of a partnership known as Robert L. Nowland Associates was understated. 2. Whether Robert L. Nowland Associates overstated its advertising expense. 3. Whether Charles and Virginia Nelson overstated the advertising expense from their "numbers" business for 1950. 4. Whether Charles and *225 Virginia Nelson realized capital gain on the sale of yearling horses. 5. Whether Charles and Virginia Nelson overstated the depreciation expense on their breeding horses. 6. Whether farm expense of Charles and Virginia Nelson was overstated due to a portion being attributable to production of food for their own consumption. 7. Whether amounts paid as salaries to officers of The North Beach Amusement Company, Inc., were properly disallowed as deductible expense. Respondent disallowed deductions for charitable contributions by Robert and Mary Nowland, but no evidence was introduced, and we regard the issue as conceded. There is no dispute as to the additions to tax for substantial underestimation of tax and computation of the amount can be made under Rule 50. Respondent concedes on brief that an error was made in the deficiency notices to Robert and Mary Nowland and to Charles and Virginia Nelson for 1950 in that the partnership profit before expenses of Robert L. Nowland Associates as determined by respondent was overstated by $4,400. Findings of Fact Some of the facts have been stipulated and are hereby found. Robert and Mary Nowland filed joint individual returns with *226 the collector of internal revenue for the district of Maryland, as did Charles and Virginia Nelson. The North Beach Amusement Company, Inc., filed its corporate returns with the same collector. I. Robert L. Nowland Associates In late 1944, Robert and Mary Nowland joined Charles and Virginia Nelson to form a partnership known as Robert L. Nowland Associates, hereafter sometimes referred to as Associates. Associates took over the operation of a numbers game formerly operated by the Nelsons. During the period from October 1, 1947 to June 30, 1950, each of the Nowlands and the Nelsons was an equal partner. Bettors wagered that a certain number from 000 to 999 would prevail on that day. A writer or location man accepted the bets and made out bet slips showing the amount bet and the numbers selected. Each operating day a runner or pick-up man collected the money and bet slips. The runners then reported to Associates which backed or underwrote the game. The writers were associated with the runners rather than with Associates. The runners turned in the daily bet slips to Associates but not the money for that day's play. Clerks employed by Associates totaled the bet slips. Later in *227 the day the "hit" or winning number was ascertained from race track mutuels, and a "payoff sheet" was made up. The runner was permitted to retain 30 per cent of the total daily bets reported, most or all of which was given to his writers as their compensation. If the remaining 70 per cent exceeded the pay-off on hits, the runner turned in the excess to Associates on the following day. If the hits exceeded the remainder, Associates paid the balance to the runner. Winning bettors were normally paid at odds of 600 to 1; however, odds on certain numbers were cut to 400 to 1. Associates compensated the runners by payment to them of a commission in addition to the retained 30 per cent. This additional compensation amounted to 25 per cent of the excess of 70 per cent of the bets submitted by the runner for the month over the hits paid out of his bets during that month. The runner received no commission if hits exceeded 70 per cent of the bets tendered by him during the month, and payment of commission was not resumed until any loss had been recouped in following months out of the excess of Associates' share of that runner's bets over hits. Bet slips were destroyed after 3 days and the *228 pay-off sheets were destroyed after 1 week. Daily winnings or losses to Associates on bets by an individual runner were recorded on a monthly form maintained for him with a separate line for each day. These records had been retained but were destroyed prior to a trial of the partners for a gaming law violation and were not available at the time of investigation. Associates maintained a ledger in which one sheet was used for a week's business and a separate line on each page for daily operations. No information returns were filed reflecting payment on individual bets. Information returns were filed only for the runners. Virginia and Mary each kept a copy of the ledger. Virginia obtained the figures for her copy from a slip of paper made up for her each day. The first of six columns in the ledger was headed "B" and represented total daily bets. Under "H" were the hits for the day. The third column, headed "CO." was for the 30 per cent commission. A column headed "O.L." was for overlooks, or hits which were not noted on the day they occurred but were discovered and paid later. "EX" headed a column for expenses and the sixth column, "ITEMS" described the corresponding expenses in the *229 fifth column. The additional compensation or commission to runners, also referred to as the "men's end of the business," was recorded as an expense. On the ledgers, the total bets, hits, commissions and overlooks are recorded as follows: Fiscal Year
Ended
September 30
Bets
Hits
Commissions
Overlooks
1946
$3,203,931.92
$1,899,623.52
$960,315.94
$96,307.62
1947
2,620,023.19
1,543,024.50
786,194.94
56,560.20
1948
1,903,151.85
1,093,347.85
571,110.52
56,457.40
1949
1,604,605.52
886,172.90
481,362.94
78,558.80
* 1950
1,034,344.14
610,717.34
310,664.11
70,478.50
Total of "men's end of the business" and of all other expenses, as shown in the ledgers, is as follows: Fiscal Year
Ended
Men's End of
Other
Total
September 30
the Business
Expenses
Expenses
1946
$73,507.32
$63,344.58
$136,851.90
1947
59,703.44
65,231.21
124,934.65
1948
49,959.97
63,090.90
113,050.87
1949
44,255.31
56,442.78
100,698.09
* 1950
14,295.02
43,043.19
57,338.21
The ledgers had no capital or cash accounts, nor did they contain information *230 sufficient to construct those accounts. Respondent determined that the profit before expenses was four times the "men's end of the business" for each of the fiscal years ended September 30, 1948 and 1949, and the period ended June 30, 1950. He made no adjustment of profit before expenses for the last 6 months of 1950 when the Nelsons operated the business formerly operated by Associates. None of the partners or office employees were ever arrested for violation of antigambling laws during or prior to the years in question. Certain runners and writers were arrested during this period and fines were usually imposed. The writers and runners did not pay their own bail bond fees, court costs, fines, or attorneys' fees. No entries were made on the ledgers to reflect payment of these expenses or of "protection" money to law-enforcement officers. The profit before expenses of Associates was understated in the amounts determined by respondent for fiscal years ended September 30, 1948, and September 30, 1949, and the period ended June 30, 1950. II. "Advertising" Expense Included in the "expenses" in the ledgers maintained by Associates were items designated "advertising." "Advertising" *231 was charged with certain bonuses and additional compensation to employees. These entries totaled $9,814.90 and $10,988.83 for the fiscal years ended September 30, 1948, and September 30, 1949, respectively. Total for the period ended June 30, 1950 was $10,285.35. Associates maintained no record of persons to whom the payments were made. Associates purchased 220 turkeys in 1948 at a cost of $3,105.83 and 303 in 1949 costing $3,429.38. Each year they gave a turkey to each of the 15 to 20 office girls, as well as to each of the runners. The number of runners is not established but three appeared at the hearing. The writers for one runner also received turkeys. A runner usually had from 5 to 10 writers working for him. Each runner and each office girl received an annual cash bonus of $50. One runner, employed during 1949 and 1950, received $200. Later, all the writers working for the three known runners received, in lieu of turkeys, a Christmas cash bonus in sealed envelopes. Respondent disallowed 75 per cent of the deductions claimed for advertising expense. Associates did not incur advertising expenses in excess of $2,453.73 and of $2,747.21 for fiscal years ended September 30, 1948, and *232 September 30, 1949, respectively, and of $2,571.34 in the period ended June 30, 1950. III. Charles and Virginia Nelson On July 1, 1950, Associates was dissolved and the Nelsons continued the business formerly conducted by it. The Nelsons underwrote the game and kept records in much the same manner as had been done by Associates. The Nelsons purchased 302 turkeys at a cost of $2,907.14 in 1950. On the records maintained by this business for the period from July 1 to December 31, 1950, "advertising" was charged with $9,066.37. Respondent disallowed advertising expense in excess of $2,266.59. The Nelsons did not incur advertising expense in excess of $2,266.59 during the period from July 1 through December 31, 1950. IV. Sale of Horses Charles made a yearly trip to the auction at Lexington, Kentucky, where he put on the block the entire crop of yearling horses bred on his large farm at Ritchie, Maryland. He arranged for a "reserved bid" or for someone to bid on horses he intended to retain. He employed that procedure to facilitate sales at higher prices. He advertised the sale by including a notice in his frequent breeding advertisements in trade journals and by specially *233 prepared sales catalogues. The horses sold were foaled on the farm. Yearling horses were too immature for breeding. Charles kept detailed records of each horse, and each was a registered thoroughbred. Successful race horses are desirable for breeding purposes. He attempted to improve the blood strain of his horses. He had been breeding horses since 1938. Charles received breeders' awards and prizes amounting to $350 in 1948, $1,487.50 in 1949, and $1,380 in 1950. In earlier years, Charles had reported income from sales of yearling horses as ordinary income. An agent of respondent changed the items to long-term capital gain and Charles has since reported the income consistent with that change. [1] Respondent now treats proceeds of the sales of these horses as ordinary income. He made an exception in 1950 for a race horse sold for $10,000, which he conceded to be long-term capital gain. The yearling horses sold were property held primarily for sale in Charles' trade or business. V. Depreciation on Horses The Nelsons claimed net losses on their returns from operation of their farm. They *234 included as an expense contributing to the losses in 1948, 1949, and 1950 depreciation on horses used for breeding purposes in the amounts of $16,563.63, $23,654.28, and $32,144.21, respectively. A mare is not bred until 3 years of age, and may not drop its first foal until 4. Mares have been known to produce as many as 18 foals, but that is very unusual. In making up the schedule of depreciation the Nelsons determined the useful life of certain horses as shown in the following table, included in a stipulated exhibit, which compares the useful life according to the notice of deficiency: Age at Which
Useful Life Ceases
Age at
Per
Date of
Acquisi-
Per
Notice of
Name of Horse
Acquisition
Cost
tion
Returns
Deficiency
Bingo Bridgett
1/ 9/46
$ 4,500
7
12
16
Hutaka
11/15/45
1,500
8
12
16
The Watch
12/29/45
3,500
5
12
16
Blossom Lane
11/19/46
15,000
7
12
16
Hurriette
11/18/46
13,000
6
12
16
Evening Shot
10/11/46
3,566.70
6
12
16
Pruning
11/18/46
6,200
7
12
16
Streamer
1/ 9/47
350
7
12
16
Ballaroyal
8/ 4/44
$ 1,800
1
12
16
Sickleup
8/ 4/44
2,000
1
12
16
Bullperin
8/ 4/44
3,500
1
12
16
Paren
8/ 4/44
5,800
1
12
16
Ficolas
8/ 4/44
3,200
1
12
16
Riskabule
8/ 5/47
11,000
1
6-12
8-16
Sir Francis
11/18/46
8,000
4
8-12
8-16
Aerial Hostess
8/28/48
3,200
1
6-12
8-16
Raldo
11/29/48
10,300
9
12
16
Helens Gold
11/29/48
500
4
12
16
Two Nots
12/30/49
2,000
2
12
16
Bill
4/ 1/44
100
5
9
10
Machree
4/ 4/49
900
11
15
16
Donita M.
7/29/49
36,000
13
16
18
Brine
11/ 5/49
1,500
4
12
16
Blue Flyer
11/ 6/49
12,600
12
16
18
Roman
11/ 9/50
7,500
13
16
18
Alpoise
12/ 1/50
17,100
13
16
18
Toddle On
12/ 1/50
6,000
15
17
18
*235 Cost, salvage value, and age at time of acquisition are not in dispute, nor is the useful life of certain other horses. Several small differences in depreciation on horses not in dispute as to useful life are assumed to be conceded, since they are uncontested. The Nelsons did not claim excessive depreciation expense due to incorrectly estimating the useful life of horses purchased for breeding. VI. Disallowance of Farm Expense On their farm the Nelsons maintained a garden plot. In addition to the vegetables from the garden, they raised some chickens and livestock for their personal use. Substantially all their food came from the farm. Some of the farm employees, as well as the Nelsons, worked on the plot and in raising the livestock. The Nelsons canned food for consumption during the winter months. Separate records of expenses incurred in raising the food for personal consumption were not kept. Respondent disallowed $1,000 of farm expense for each of 1948, 1949, and 1950, as representing expenses attributable to produce personally consumed. The Nelsons deducted excessive expenses of $1,000 attributable to food for personal consumption. VII. The North Beach Amusement *236 Company, Inc. The North Beach Amusement Company, Inc., hereafter referred to as North Beach, operated an amusement park in North Beach, Calvert County, Maryland. It owned a narrow strip of land along the west side of Chesapeake Bay. Along the beach and on a pier projecting into the Bay were a sea food restaurant, dance hall, soda fountain, beach stand, bathhouse, bar, arcade, bingo game, hot dog stand, wheels and dart games. Operations included selling food, beverages and novelties, renting boats, bathing suits, and beach umbrellas, and conducting or operating moving pictures, dances, bingo, amusement games and slot machines. In 1936 Charles bought a half interest in the corporation and 2 or 3 years later purchased the remainder of the 316 outstanding shares for himself, his wife and children. During the years in controversy, Charles held 166 of the $100 par value shares and his wife, his son, and his daughter each held 50 shares. Charles has been president of North Beach since 1938, Virginia served as treasurer since 1939 and as secretary since 1946. In 1939 Charles lent $65,609.40 to North Beach in return for a 1-year mortgage. The principal of the mortgage debt was paid in *237 nine installments, the last one being made in July of 1947. All the present buildings and the pier were constructed following this loan. The board of directors of North Beach authorized payments of $9,000 each to Charles and Virginia in 1940. No compensation of officers was authorized or paid for the years 1941 through 1946. In 1947 it authorized and paid salaries of $2,000 to each officer, and in 1948, $4,000 to each. In 1949 Charles received an authorized $9,000, and Virginia, $6,000. For each of 1950 and 1951, the authorized payments were $14,000 and $10,000, respectively. Each authorization was made in September of the year to which it applied. Wages and salaries, other than compensation of officers, deducted by North Beach in its returns were: Year
Amount
1945
$47,235.17
1946
39,915.30
1947
34,503.53
1948
33,623.48
1949
40,176.38
1950
37,166.37
1951
35,188.12
North Beach declared and paid no dividends through 1946. In 1947 it paid a 10 per cent dividend amounting to $3,160. In each of 1948, 1949, and 1951, it paid a 20 per cent dividend amounting to $6,320. The 1950 dividend was 50 per cent and amounted to $15,800. The Nelsons devoted much *238 time and effort to North Beach after their acquisition of all the stock. During the taxable years, Charles and Virginia were in full and complete charge of North Beach. In earlier years, a general manager had been employed on a salary plus bonus basis. After he left in 1946 or 1947 others were hired but with no success and the Nelsons were obliged to take over this task. The bar and bingo game were run by others on concessions. The sea food house was run by others on concession for an undisclosed part of the time. Each of the other operations had a manager or employee in charge. Activities of the two officers included interviewing and hiring up to 150 employees, overseeing each operation, running the office, keeping the books, supervising the cashiers, and handling the money. To prepare North Beach for its season, the Nelsons had to make plans, clean, paint, make repairs, stock merchandise, and visit different business houses. The Nelsons maintained an apartment at North Beach which they used part of the time, especially during the busy season. The regular season at North Beach begins May 30th and ends on Labor Day, but certain amusements, principally the arcade and the hot dog *239 stand, are opened as early as February and remain open as late as November or December, depending on the weather. In the arcade, and in other locations on the pier, were a number of slot machines. Some of these machines had been available for public use for a number of years prior to those in controversy. During and immediately after World War II it was difficult to acquire slot machines. In 1948 North Beach decided to wait for more improved types before purchasing new ones. Later, it purchased and installed a substantial number of new machines. A principal source of income during 1949 and 1950 was the proceeds from the slot machines. The gross receipts of the entire North Beach operation and the net income, after the disputed salaries but before payment of Federal income taxes for 1945 through 1951, were as follows: Year
Gross Receipts
Net Income
1945
$158,295.89
$ 1,434.30
1946
161,449.82
17,548.13
1947
159,089.66
43,667.44
1948
168,220.33
46,338.72
1949
179,242.44
30,026.76
1950
201,478.13
41,444.57
1951
202,811.06
44,953.09
In connection with his horse farm, Charles made it his practice to answer all correspondence. Charles was a *240 member of two partnerships, P. and N. Amusement Company and Nelson and Main, during this period. The latter partnership was terminated after the illness of its managing employee because it involved too much work. The Nelsons actively operated the numbers lottery after they took over from Associates. Virginia then kept the records for that business. At the time of the hearing Charles was serving a 1- to 3-year sentence for violating the antilottery laws of the District of Columbia. Between 1923 and 1930 he was convicted two or three times for violating the law prohibiting possession and transportation of alcoholic beverages. Respondent determined that reasonable salaries for Virginia and Charles were $3,000 and $5,000, respectively, for each of 1949 and 1950. Reasonable salaries deductible by North Beach as compensation of officers were $4,000 for Virginia and $6,500 for Charles in 1949, and $6,000 for Virginia and $10,000 for Charles in 1950. Opinion I. Although Associates produced a ledger supposedly containing figures as to their net income, the evidence demonstrates that this was not such a record as may be relied upon as an accurate reflection of their operations. *241 Failure to maintain proper records was of their own doing and they are in no position to complain if respondent resorts to other means to arrive at the necessary figures. . Respondent determined the amount of the partnership gross profit by multiplying the commissions to runners or "men's end of the business" by 4 since it was shown that they were together given bonuses totaling 25 per cent of the retained profits of the gambling enterprise. This is characterized as erroneous by Associates because of their insistence that if a runner left their employment owing the game money or "with a red book," the 25 per cent computation would not apply. The difficulty is that the burden of showing that state of facts was on the petitioners and they have failed to carry it. Two of the runners were unable to remember whether their books were "in the black" or "in the red," and the third was so vague and confused in his testimony that we cannot base any finding upon it. And the testimony of petitioners, all of which was on cross-examination, was likewise too indefinite as to time and amount to be acceptable. *242 It follows that in this respect, for failure of proof, the deficiency must be sustained, except as to the conceded overstatement of income for 1950. II. A deduction will not be disallowed in its entirety for failure to establish the exact amount. . But where, as here, respondent has allowed part of a deduction, we will not alter his determination unless facts appear from which a different approximation can be made. [Dec. 11,754]. Respondent disallowed 75 per cent of the "advertising expenses" deducted in the computation of net income reported on the partnership returns. Viewing the evidence in a light most favorable to Associates the $2,453.73 allowed for the year ended September 30, 1949 is greater than the total of cash bonuses paid:$50 to each of 20 office girls and two known runners, $200 to another runner, $10 to each of 30 writers, and the cost of 33 turkeys, averaging $14.12 each, *243 distributed among the office girls, runners and the writers employed by one runner. For the period ended June 30, 1950, no change appearing other than the average cost of turkeys being $11.32, respondent's allowance of $2,571.34 is again greater than the substantiated amount. Accordingly, respondent's determination is approved. III. During the last half of 1950 the Nelsons deducted advertising expenses as did Associates in earlier years. No additional facts were adduced except that the average price of turkeys was $9.63 each. It follows under the same reasoning as in Issue II that respondent's disallowance of advertising expenses in excess of $2,266.59 must be sustained. IV. Charles operated a farm and, in the course of his business, bred horses. Whether or not animals sold by him created ordinary income on the one hand or, on the other, capital gain because the animals sold were held primarily as breeding stock is basically a factual issue. ; . *244 While the age at which animals are sold is only one factor to be considered and is not conclusive where other evidence appears, ; , it may be the only test where the record is lacking in other criteria. , affd. (C.A. 4) ; . Here the proof shows that Charles put up for sale all of his yearling horses and that apparently the minimum breeding age was 3 years. We can discover no reliable facts which contradict the implication to be drawn from this evidence as to age. The only other material in the record is Charles' own statements as to his intention and the fact that Charles himself bid in some of the horses, which is at least as consistent with the conclusion that the balance were held primarily for sale. The former we disregard both because of other contrary statements made by him [2] and because of the inherent infirmity of his reliability as a witness. , affd. (C.A. 5) . The conclusion *245 embodied in our findings of fact is, accordingly, that the animals sold were not capital assets but were held primarily for sale in the ordinary course of Charles' business. V. Respondent increased [3] from 12 to 16 the age at which useful life ceases for certain breeding horses used by the Nelsons on their farm. Several reasons are cited for the increase: The Nelsons used a number of fully depreciated animals, Charles purchased several horses 12 years of age or older, and the Nelsons have not proved their estimate. The Nelsons resist the increase by claiming their estimates were based on information from two sources: Bulletin F. Internal Revenue Service, which shows under "Agriculture" an estimated useful life of 10 years for breeding or work horses, and an estimate derived from Charles' experience in horse breeding and consultation with other breeders. That respondent's first two reasons do not justify an increased useful life seems almost self-evident. The age at which usefulness ceases being, *246 at best, a well-reasoned guess, it is as certain that some animals will remain productive after being fully depreciated, as that others will prove useless before their cost has been completely recovered. Purchase of certain animals, all but one with comparatively high costs, at an age greater than that usually estimated, proves only that such animals have, even at an advanced age, special value to the buyer, but does not impinge upon the validity of general life estimates in other cases. And as to each of these late purchases the Nelsons adopted longer anticipated useful lives. In arguing the failure of proof, respondent denies that Bulletin F is applicable to breeding of race horses on a farm, but produces no convincing reason. He disputes Charles' reliance on his own experience, aided by consultation with others, by blasting one statement made by him. It is inescapable, however, that the over-all tenor of Charles' testimony shows such reliance. Charles has come forth with evidence, and, on all the evidence presented, we must find that respondent's increase in the estimated life of any horses was unwarranted. VI. The Nelsons presented no evidence of expenses incurred in production *247 of food for personal consumption except conflicting estimates of the size of the garden. Although farm employees admittedly worked in that garden the Nelsons allocated no labor cost or any other farm expense to the home garden. For failure of proof, respondent's disallowance for each year of $1,000 of farm expense as a personal expenditure attributable to food for the Nelson's own consumption must prevail. VII. The final issue is the reasonableness of salaries paid by the Nelson's wholly owned corporation. This issue is one of fact, , affirming ; , and is disposed of by our findings, a factual conclusion which we have reached on careful consideration of the entire record. Decisions will be entered under Rule 50. Footnotes
*. Period ended June 30, 1950.↩
*. Period ended June 30, 1950.↩
1. Another agent testified that Nelson had told him that he raised the horses to sell.↩
2. See footnote 1, supra.↩
3. Respondent also increased the estimated useful life of one horse from 9 to 10, one from 15 to 16, four from 16 to 18, and one from 17 to 18.↩